The issue in this case is whether there were Fourth Amendment violations during the checkpoint stop of Mr. Keller's vehicle. The answer is yes, for three reasons. First, the sniff in the primary area was a search under Cabales and Kylo because a Border Patrol K-9 can detect lawful activity in primary. Second, there was a trespass under Richmond and Jones because the K-9 put its paws on the bumper while being deployed to learn about what was inside Mr. Keller's vehicle. And third, the so-called pre-search in secondary was actually a search for which the government didn't yet have probable cause. The secondary sniff procedure hadn't happened yet and the K-9 hadn't performed a true alert. The sniff in primary was a search in Cabales and place. The Supreme Court held that a drug dog sniff is not a search, but key to that conclusion was the fact that the dog only alerted to the presence or absence of contraband. But in this case, we have different facts. The sniff doesn't reveal only contraband. Instead, Border Patrol K-9s trained to detect concealed humans will also alert to lawful activity in primary and that's why they have the secondary sniff procedure built into the training program. The secondary sniff procedure is another sniff and another alert after the visible occupants have been removed. On the first and the third point, sniff equals search and then secondary itself was a seizure, not a search, correct? My argument is that in the pre-search, they actually search the vehicle. The pictures that I put in my opening brief of the video show two different agents putting their torsos. I guess if I'm remembering our recent published case law, we have Martinez that broadly says a sniff isn't a search and then Davila, you know Davila. In Davila, I thought we were pretty clear that moving someone from primary to secondary itself doesn't need particularized reasons. In Martinez, the argument was that Border Patrol K-9s cannot reliably detect concealed humans because they're too short to see inside a tractor trailer. But I've made different arguments in this case about the sniff in primary being a search and the trespass argument and also that the secondary sniff procedure had to happen in order and that there wasn't a true alert. So those arguments were not presented in Martinez. So the court didn't decide the arguments . . . Is this first impression, Ben? I'm sorry. No, no, it's good. If it's not . . . I think Judge Higginson was asking if the case law was to the contrary and then I'm asking you if there's any case law that's ever gone for you, I guess, or either way in any jurisdiction. It seems that this would be a very broad expansion of restrictions on the ability to use K-9s if we were to agree with you. Perhaps I'm missing something. The other cases have not addressed this argument because they don't seem to have had the same record or at least the arguments haven't been made based on the record. So in this case, we have the Border Patrol's Coordinator for Research and Development testifying that, yes, the dog would alert to lawful activity in the primary area and that's why they've built into the training program this secondary sniff procedure. So after the visible occupants are removed, then the dog has to sniff again and has to alert again. Why is that a problem? That seems like a protection for people that if it might give false positives on occasion, we're going to make sure that before we do any more detailed search that we take you to the secondary and it has to alert again. That actually . . . doesn't that protect people from getting a detailed search if it has a false positive at the initial . . . I guess I'm missing something. It's not about it being a false positive in primary. It's about that it's actually a search under the Supreme Court's cases of Cabales and Kyllo because the difference between the thermal imaging device in Kyllo and the dog . . . the drug dog sniff in Cabales was that the thermal imaging device could detect lawful activity. It wouldn't necessarily detect lawful activity. But it was . . . it was intimate activity in the home. Here, the sniff isn't telling you anything intimate and it's not in the home. This is a border stop. What's your circuit level case? I mean . . . Applying either Kyllo or Cabales? My argument is based on Cabales and Kyllo . . . But do you have no circuit decision then that you're relying on for that first argument? Also, the McKnight decision out of the Colorado Supreme Court, so not directly responsive to your question. But in that case, the court can . . . If we're not persuaded, and obviously we'll study it and we have that argument, but you had a series of arguments. Can I ask just to clarify one negative? You are not challenging as clear error the district court's footnote finding that there was no cue from the handler. That's correct. You aren't. Okay. So, if we don't agree that the sniff is a search and we don't agree that a police officer putting elbows on the car or a dog putting paws is anything more than incidental, do you have an argument based on what I thought was the core, which is this dog's signal behavior at the very end wasn't sufficient to go into the back of the vehicle? My argument is that the dog's behavior in primary was not sufficient because the dog didn't give a true alert within the meaning of Harris and DuPaglio . . . But if I'm not . . . If I find it challenging without circuit-level authority to accept that there had to be any suspicion to move to secondary, my question is do you still have a further argument that there never, PC never was acquired to be able to go in the car? Or is that not an argument you're making? I'm not . . . I don't think I'm making that argument as far as I understand the court's question. Well, I guess the specific thing is it seems to me if we avoid terminology like alerts and indications and casting and instead we just follow DeVio, which says if a dog takes the stance or the position that reflects that because of its training it's detecting a concealed human or contraband, that is PC. And as I looked at this record, although it's not really the government's argument, this dog did sit prior to going into the back of the vehicle. The dog sat after the secondary sniff procedure had happened, but my argument is that an unlawful search had already taken place. So that is the argument. You're not contesting that when a dog indicates or sits, that is PC. That's not your argument? Right. My argument is that the dog sat too late in this case because the unlawful search had already happened when the agents physically intruded inside of the vehicle. Oh, you mean when they went in the door, the front door? Yes. Yes. They called it a pre-search. My argument is that under the definition in Jardines and other cases when— How did that team, what did they get? They just go in to make sure there are no weapons. That may have been an improper intrusion. I understand that. But how does that in any way interrupt what the dog did to find the illegal non-citizen? That was part of their process before doing the secondary sniff procedure. And they didn't have a right to go into the car yet because they didn't yet have probable cause since in primary the dog had not yet performed its trained indication. What was the—remind me what the district court's answer in the government was as to that door entry? Because I agree that's before the dog sat. Can you remind me what the district court said about that? The district court said that the presumption under Harris applied and that the arguments with the defense expert and other arguments were made in the district court that there was nothing to upset that presumption. So with my argument about the true alert not happening, that is that the, you know, in the meaning of Harris, when they say alert, they actually mean indication in the border patrol sense. And the state of Florida's briefing makes that clear. They talk about how the dog alerted, which was they performed the trained behavior of sitting, which the dog had been training for hundreds of hours. And with Dovali Avila, this court's case, when the court said that the dog alerted, the dog meant the dog performed its trained behavior like a trained dog. You acknowledge it did that before they went in and found the illegal alien, correct? It did do alert in the—I agree, the terminology gets very mixed up. But essentially, an indication in this case equals a strong alert, equals PC. Yes. Yes. So your argument hinges on either there being a search at the very front end, primary to secondary, no PC for that because it's a weak alert, or your argument depends on the entry through the door didn't yet have that indicator. Is that—am I characterizing your arguments correctly? Right. The entry through the door did not have the—there wasn't probable cause yet at that time for them to physically intrude inside the vehicle. And then also the argument about the sniff itself and primary being a search based on the secondary sniff procedure. I mean, I guess you do have an array of arguments, which is appropriate. But when you say there was a trespass, you know, what—again, I'm going to ask you for your best circuit authority. I'm thinking cats, reasonable expectation of privacy. When a police officer gives you a ticket, they're going to lean on your door. How is that different than the dog paws on the car? In this case, the contact wasn't incidental. It wasn't like a dog's tail brushing against the side of a car. It was, as the agent testified, when the dog put his paws on the bumper, he was sniffing the seams. And also, although the agent did testify that the dog had alerted earlier when it was still two lanes of traffic away from Mr. Keller's vehicle, that really was the beginning of the process. The agent also testified about how the tracing and drafting and basically testing the dog's interest still had to happen. And that all was still ongoing when the dog committed the trespass. And this court's decision in Richmond solves a lot of the questions about what can be a trespass. Although that was a trooper and not a dog, in that case, the court rejected the argument that a relatively minor physical contact wouldn't be a trespass and also acknowledged that it could seem insignificant that the trooper in that case had tapped the tire of the vehicle. It didn't cause any damage. But nevertheless, that was a common law trespass. So in this case, it's under the Dorff case as well out of the Idaho Supreme Court. That case goes through the common law trespass analysis with Blackstone and the restatements and finds that the dog can commit a trespass under all of those authorities. And then we also have the Bowler case that the government provided in the 28J letter. And that case is the Iowa Supreme Court. And the majority in that case actually agrees with the Dorff case as far as the common law trespass analysis. But then the majority ignores this court's decision in Richmond. It can. It's allowed to. It's not bound by this court's decision in Richmond. But the dissent in that case actually invokes the court's decision in Richmond and holds that it was a Fourth Amendment violation. And then, of course, the Supreme Court's decision in Jones, which this court recognized in Richmond, provided a C change. So it doesn't have to be violating a reasonable expectation of privacy. There's also the trespass-based analysis for Fourth Amendment violations. Again, on your third point, your best authority that moving a vehicle from primary to secondary actually requires some level of suspicion is what? What's your best federal circuit authority? Or you don't have one? It's the movement. It's not just my argument isn't just the movement from primary to secondary. It's also the fact that the search took place when the car first got to secondary before the secondary sniff procedure happened. The agent testified that he would have walked away had the dog not alerted again. And that's consistent with the testimony about the training that to detect concealed humans, they have to go through the secondary sniff procedure. So the argument isn't just the movement of the car from primary to secondary, but the fact that they physically intruded into the vehicle before doing the secondary sniff procedure, which was a necessary part for their training program. Okay.  So in order to find for you, for your client, would we have to determine that the district court committed clear error because the district court specifically found under the totality of the circumstances that Jagus' alert was not subjective and was a sufficient probable cause and that the pulling of the handler over to the vehicle was constituted an objective alert and it doesn't have to be only the sitting, but that the pulling itself was an objective alert and that under the totality of the circumstances, it was a, why would we not have to defer to that absent clear error? My understanding of that part of the district court's order was it had to do with the arguing argument that was made in the district court that I have not made on appeal. Instead I've made the variety of arguments that we've discussed, including that the, under Harris and Dovali-Avila, it has to be a true alert, which is indication in the border patrol sense. And of course, whether there's probable cause or not is a legal determination for this court to make. And the totality of circumstances does include the testimony that the secondary sniff procedure is built into the training program and the agent would have walked away if he didn't get that second alert. Even though we had the behavior of the dog in primary, he would have walked away if the dog hadn't alerted again in secondary after the visible occupants had been removed. Okay. But, okay. So your first argument that the dog, you say a sniff equals a search. Okay. But our case law says a sniff does not equal a search, Dovali-Avila. Okay. So it was explicitly, that's a quote from the case, that it doesn't equal a search. Doesn't it? Does not constitute a search. So the sniff itself is not a search. So the, so the, I don't understand how the first argument can go. The second one, the pause thing, there's, you know, I don't know that there's any case law that says putting your, the pause up on the bumper is any sort of intrusion. So it's, so the only thing that you have is that the agents went into the vehicle to check for weapons, right? I see I'm out of time. No, I want you, I'm giving, that's, I'm, we can give you more time and I would like for you to address, I'm trying to go through each of your arguments and what the problems were with them. And I think, I mean, to start with the first argument, I think there is case law support in Caballos and Kylo, which talk about whether the sniff can detect lawful activity. And in this case, we have different facts where it's not a drug dog. Drug dogs don't need two sniffs and two alerts. They can do it all in one. Concealed human detection dogs need two sniffs and two alerts. Otherwise the agent would walk away. And we have the testimony from the border patrol training director, coordinator, research and coordinator person who says that that is built into their training program. Those facts were not before the court in Dovali, Avila. But the other case, the Tilo case says concealed aliens at immigration checkpoints is included in the thing, not just drugs. And the sniff is not a, um, that they can use a sniff to determine that. And that's, so the fact that you need two or one or three or seven sniffs or none of that is pertinent. It's just sniffs are not actionable at a border checkpoint. The court has said that a lot in cases that didn't involve these facts and involve drug detection dogs, like in Florida v. Harris. So the facts in this case are different. Okay. So that's the, that's your argument. Just this says unique facts. And so under the unique facts of concealed aliens, we shouldn't apply the normal rule. Is that the argument? It's because of the testimony in this case from the government's own witnesses about how the training works. Okay. And then so the seizure and the pause. Yes. So under Richmond, a common law trespass is a search under Jones and the Dorf case specifically applies that to the dog doing the activity instead of the... It seems so unintrusive. You know, I remember being on the bottom side of a case, you know, in dissent where I wrote about them ripping up some guy's boots to look for contraband and ruined the boots. And that was the bottom side of the case. So this is not, this doesn't hurt the car. It doesn't hurt the resting the paws momentarily. It's similar to the officer leaning on the, next to the window or over the edge. I don't see, and you don't have, what's the best case for that?  In Richmond, the trooper tapped the tire. It didn't cause any damage. It seemed relatively insignificant and minor. And this court held that that was a common law trespass.  And then the third one. It's Richmond, Jones and... No, no, no. I'm sorry. I'm asking you your third argument. Oh, the third argument. You can have an extra three minutes too if you need it. So, but I'm just trying to get a feel for what these arguments are because it seems that they're a vast extension of the case law. So I'm just trying to give you every opportunity to help explain. I'm trying to make arguments that are different from arguments that have been decided in other cases. And a lot of the cases involve drug dogs.  So, but some of them mentioned in passing or, you know, concealed aliens or undocumented persons or illegal aliens, whichever term you prefer. Some of them actually say drugs or concealed individuals. Right. And in those cases, the lawyers didn't challenge the training. They didn't have the evidence in the record to challenge the training. And in the Tello or Tejo case, for example, that was a lot about the Rodriguez extension of the stop and whether there was enough suspicion or they, whether they could suspend the stop to do it. They didn't challenge in that case, the training of the dogs to detect concealed. Okay. So the third point that they went into the car to make sure they'd be safe. That didn't, that was a search under, because it was a physical intrusion and didn't yet have probable cause as the secondary sniff procedure hadn't happened yet. And they didn't, the dog had not given a true alert. Okay. Thank you. You've saved time for rebuttal. I appreciate it very much. May it please the court, Loretta Berry for the United States. Oh, and she gets three extra minutes because I took three extra minutes. I don't know if she'll need them or choose to use them. Thank you. This court's recent decision in Martinez forecloses the argument that probable cause is defeated because a dog could alert to a concealed passenger that turns out to be legitimate. This court relied upon the Supreme Court's holding in Harris that probable cause is never viewed in hindsight, depending on what is or isn't turned up. Probable cause doesn't require absolute certainty. In Martinez, the dog was certified to alert to concealed humans and to drugs. What does that mean, concealed individual that turns out to be legitimate? I don't understand why people are being concealed at the border checkpoint and how that would ever be legitimate. Well, what I, what I understood from the appellant's brief is that somebody could be sleeping under a blanket, Your Honor, and the dog could alert to that. And therefore, that makes the probable cause, that, that defeats probable cause. Or for instance, a baby could be sleeping that's not visible, and therefore, probable cause could be defeated in that circumstance. But this court rejected that argument in Martinez because the court said that a dog that's certified to detect drugs and concealed humans, the alert could have easily been to drugs, as is the case in these facts. Therefore, absolute certainty isn't required as to what is going to be discovered. Now, so the only question after an alert happens for the district court is whether it's reliable. And the district court specifically credited the testimony of Agent Sandoval that this dog alerted, and I quote, at record 413 of the order. He alerted with rapid shallow breath and a change in posture. Then he also credited the testimony of the CBP under their certification procedures that this court actually recognized in Martinez. They have been doing these procedures with concealed humans for 40 years. I guess I still am having trouble with the initial premise. The fact that the dog could alert initially on a baby under a blanket, allegedly. So then that would, that's why you have the second part of it. Exactly. It's okay to alert on it. That's why you make sure that you're correct that it's a problem. It doesn't mean that it's, you can't alert initially to go to second, because going to secondary is not an invasion of the rights of the people. Exactly. Under our case law. So I don't understand how, even if it were to alert on sleeping babies under blankets, that just means that you need to check to see if the sleeping baby under a blanket is a person being smuggled for some sort of nefarious purpose or something. And that is, that gets me to my second point. That is exactly correct, which is what Judge Higginson had asked about the referral to secondary, which is to create a broad rule that there needs to be some sort of reasonable suspicion or probable cause to send a car to secondary is an absolute violation of the Supreme Court's holding in Martinez-Fuerte. Because in that case, in the 1970s, the Supreme Court held that a car can be sent to secondary for no reason at all. No reasonable suspicion, no probable cause, no reason. And this district court understood that, Record 404, because at checkpoints where the purpose is to inquire about immigration, to check documents, to ask questions about citizenship, at secondary inspection, all of that is going to be done. Therefore, the person under the blanket is going to be questioned. The baby in the car, they're going to ask if that baby is legitimate. And that is exactly what the district court understood at Record 404. So this argument, this request to create a broader rule that there has to be an alert to secondary and whether the dog alerted to secondary is a complete non-starter. Because under Harris and Duvali-Avila, once there is an alert, probable cause attaches to search. I guess the district court did hold an extensive hearing with warring experts, saw the video. Yes. So that's all helpful. But I still come away with some uncertainties. And the following, I'll give you two. Sandoval under Cross and then Delaney under Cross, both themselves are pretty candid saying, we don't know how the dog does it. Remember that? Yes. And they don't have to, Your Honor. Not under Harris, because it's not a scientific test. That's what the Supreme Court held. Is there no better answer? In other words, if we're reviewing probable cause de novo, and the government's two witnesses, the handler and the expert, just say, there's no way to explain it. We don't know how the dogs do this. Then it is a little uneasy to say, well, as courts, we're going to just say, that's enough. Well, you know, Your Honor, to that end, I would refer the court to Martinez, where the said, you know, there are dogs that are looking for humans in rubble. And they're not alerting to the searchers that are next to them. Therefore, again, that establishes that a scientific test isn't always necessary. And I would refer the court to the extensive discussion in Martinez, and in this case as well, to the certification procedures that they go through for training to alert to concealed humans. Are they, I guess I can ask this in rebuttal. Are they attacking the unreliability of the dog in the training? I believe that they did attack that. And they attacked the-  Yes. Yes, Your Honor. I believe that that was attacked. However, for this court to overturn the live testimony about that, it was extremely high standard under Wright, based upon the live testimony. The second uncertainty is more legal. And I think you'd agree that the case law has been variable as to alerts. Weak alerts, mere alerts, insufficient. You heard me describing casting insufficient. But disagree if I've said anything in the category that doesn't. Did you say cats? I'm sorry. Casting in the Rebus case. That are called an alert or indication. Okay. And yet what it does seem to be, and the decision that I'd focused on that seemed clarifying, is the decision with Judge Jones on it, De'Vea. Where that, though it's a published decision, saying for once and for all, we're going to try to clarify. And am I right that in that, weak alert, mere alert, not PC. The equivalent of what we're calling in this case an indication, yes, PC. Would you agree with me so far? No, because in this case, there is very specific testimony that there's a very, very clear distinction on what an alert was and what an indication. But the indication is the, but correct me if I'm wrong. I thought the clear expert testimony was just what Judge Jones was saying, which is, what we're looking for, avoid the words indicate and alert. What we're looking for is, is the dog exhibiting the signal behavior that corresponds to how it's been trained to respond when it detects contraband or concealed. And then in that opinion, Judge Jones was careful to say, that would mean a stance or a position as opposed to sort of spinning or pulling or staring.  And that gets me to think there was PC. It sounds like conceded today there was to go in, but we're left with the difficulty of the entry into the door. Okay. So, you know, you said trained behavior, though. Yeah. But the trained behavior is when the dog indicates. Yeah. And what we're looking at, though, is what is not trained. Okay. So the alert is the not trained. I know, but I really thought in De'Vea, we were very carefully saying what gives PC is the trained behavior when the dog responds to contraband or concealed. That's the key thing. It isn't sufficient to have it doing untrained sort of spinning and staring. So, you know, De'Vea, right? De'Vea Avila, yes. Judge Jones in that panel in a published opinion said, stance or position upon detection is what gives PC. And if that's the case, I understand the De'Vea Avila case. It was a checkpoint case. And, you know, the court said that when there was an alert, that it established probable cause once and for all. If it's going to be stance and that sort of thing, then we have testimony about that, too, that established PC. You may have it right there. I wish I'd proven it. I think, Judge, that panel was very careful to avoid using the word alert because it can be comprehensive of so much odd behavior. Okay. Well, and instead, she said what we're really distinguishing mere and weak alerts from, which are not sufficient, are dog positions and stances that they're trained to do when they smell drugs or the person. And so if that's my conception of what our controlling law is, and if I think that means they did have it to enter the back of the car because the dog sat, isn't that sufficient for you to win or is it not? Are you not defending this ruling on that basis? I'm defending this ruling on the basis of the law that the alert gives you PC. Okay. So you're not defending this? I don't. Because I think that activity happened in secondary. I guess maybe I'm not being clear. It is really totally derivative of that published opinion that we said was going to clarify everything. Avoiding the word alert. And I would have thought that the district court itself said the dog sat. Jagus was trained when it smelled humans or dogs to sit. He sat. Then they go in. You win. But you're resisting that. And I don't know why. Maybe you're just being candid and it wouldn't stand on that theory. Well, I mean, because as the agent testified and as the expert testified, you're not always going to get the sit. But you did get it. How was it secondary? Yes, we got the sit. So if you did see PC for that moment, why are you resisting this? I fully respect that you can urge us to write something else. I just don't want, I'm resistant because I don't think it should be the rule that an indication is required, that a sit is required before search can happen. I want to be very clear about that. But if you had it, we could rule, if that's the case, we could rule, regardless of avoiding the terminology, alerts to indications. Just simply saying the trained behavior, the sit, the stance or the position that the dog was supposed to do when it sensed criminality, that's crucial. All these staring and pulling and spinning, that's just sort of odd, inexplicable behavior. It's alerting. It's just reacting. Well, you have to look at the testimony, Your Honor. And the testimony, that's what the probable cause is, is looking at the testimony from the totality of the circumstances and what the agent knew. OK, so then I'll test you on that. Would staring alone ever be sufficient? If that, if a pinpoint stare was the way that a dog alerted and that was the testimony, then yes, it would. Avoid the word alert. The pinpoint stare, what do you mean by alert? As the agent Sandoval testified, an alert is not a trained behavior.  It is innate. That it is a change in body posture for this dog so that. So what if it barks, which is not a trained behavior? It's just what dogs do. If that is, if that is his, if that is the dog's alert and that is what is testified to. Alert means what if it isn't trained? The dog decides to bark. We all have dogs, they bark. It's going to be a specific, as the agent said, it's going to be a specific type of behavior unique to that specific dog. Staring and barking are unique to a dog? If it was, I mean, no, but I don't think we have that testimony here. Well, it did stare and it didn't bark, but it stared and then it spun. You're saying that alone? A circle spin on this, on this is a change in body posture. Absolutely. The circle spin, which was visible at 0.6 through 0.8, which the court district court credited. That gets me to my point about the mootness that this dog alerted before that paw touch because the district court credited the agent's testimony that this dog's alert, his rapid shallow breath wasn't visible, but his change in body posture was. And that's visible on the video at 0.6 to 0.8 when he did a circle spin, then he crosses over and traces to the defendant's specific vehicle. Let's say a squirrel had run by, so his body posture changes and he starts respirating. If that isn't trained, are you saying the government then can go into the car because the dog starts breathing hard because it may have seen a squirrel? Well, no. Well, under that circumstance, then this court would be discrediting the live testimony, which the court credited was the specific evidence that in order to find that, this court would have to say under right that the agent's testimony could not possibly have been observed under the laws of nature. That is what we would have, that is what this court would have to find clear error under those facts. And I might add that not only did he run over to the car, the district court specifically credited his drafting behavior at 0.20 to 0.25 seconds. Let me ask you two questions. At what point does the government think they needed PC? At what point in the whole chronology? And as of that point, what gave you PC in terms of the dog? Okay. It's at 0.6 to 0.8 seconds where the agent testifies at record 471 that this dog's alert is, quote, a rapid shallow breath and a change in posture. And what is visible, the district court said that the breathing, that's not going to be visible on the video. But I'm going to credit this change in posture. It's visible at the circle spin. And then later. Okay. So just so I have it down, the dog's signaling behavior is the rapid breathing. That gave PC. It's not just the rapid breathing, Your Honor. I'm asking you for a rule of law. It's breathing plus what? What else do you have to have? Breathing plus what? You have for this particular dog, Your Honor. And that's, again, my point is that you have to look at the specific testimony for the unique dog or another dog. As of what moment we had breathing plus what?  Rapid shallow breath, change in body posture, 0.6 to 0.8 seconds. That's the spinning. And then right after that, there's the crossing over to the car. That's a movement. And you don't believe that it has to be, I'm just trying to make sure I have your argument. You don't believe it has to be any sitting in any particular little posture to justify something. Just the whole fact that he's gunning for this car, the dog is gunning for this car. And that's something that's unique to that dog. And that's when he's going for it. But also it could just be, I think, any dog that's going for this particular car and such walk crossing across the thing, two lanes to get over to that car would be some sort of signal. And that there's testimony that that was a signal, isn't there? There's testimony that, let me just really quickly answer your first part about the sitting. Know that this court has held in Shen and Clayton and Harris that the type of signal, the type of behavior doesn't have to actually be a specific kind, like sitting. Then to answer your second part, the district court specifically credited at note 4, 413 of the record, that not only this dog, he drafted, he ran to the, identified the car after he did his breathing, his circle spin. He crosses one lane and he participates in what's called drafting and tracing. And it is very, very visible on this video at 0.20 to 0.25 seconds. The dog ran back and forth, back and forth. And the district court credited that. And in the footnote actually noted that Agent Sandoval, quote, did everything in his power to hold Jagus back while not pulling him off the odor. And then this four second paw touch occurs after that at 0.26 seconds. Therefore, this, there was not, the dog under all of those facts that the district court credited, that there was not a trespass. And the district court credited that those were legitimate alerts. The court also credited the testimony that this dog had never failed any training aid. Moving quickly on to the trespass point, there's been no circuit court that has applied the Jones and Hardinez test over the Cavallese test, which states that in the context of a dog sniff, it's sui generis. It's in a class of its own. And it's really fundamental to distinguish those cases of Jones and Hardinez based upon intentional touching. And here, the district court specifically said at footnote four, there was no intentional touching here. There was no, the dog was not cued. He was not encouraged by the agent. In Richmond, which the appellant relies upon, there was intentional tapping to get information. And here, the dog did nothing more than, as we argue, make an incidental contact, which is akin to kind of an elbow touch as questioning is happening by an agent of the occupants. Just bear with me if I'm still sort of fixated on what I thought our court's rule was. So if you have to live in that alternate universe, do you lose or not? We would win. You still win? Yes. But the difficulty then, you agree, if my universe is, you are stuck with it, then how, what about the entry into the car through the door before the dog indicated? Okay. Well, that would be governed by Martinez-Fuerte in the Supreme Court. Oh, when you go to secondary, you can actually go in the car quickly? You can, well, that was, let me say that the questioning and everybody's going to have to get out at secondary to, for. That's all they did here at that point? They just say get out? They actually didn't go in the vehicle? They did go in the vehicle for. So what's the authority to support that? I know you say you've already got PC, good answer if you're right, but if I'm not convinced about that, would there be a notate harmlessness or do you still think that's a legitimate not infringing Fourth Amendment without PC? Do you see my question? I do. And I would argue that as was noted by Agent Sandoval, there's a certain protection factor for the dog, for the people too. They couldn't actually go inside and search, and I don't think that's what the testimony was, Your Honor. He just opened the door and looked around to see that there were no knives. That entry had nothing to do with the dog, the laders? Correct, that's correct. Indicated, okay. That's correct, yes, Your Honor. Then, moving quickly on to the alternative arguments, just the court, this court's already rejected that alternative indications are required, and also the argument that there's a requirement to maintain field records has been foreclosed by Harris. So I would urge the court, the court could easily affirm on those alternative grounds instead of trespass, which was never presented in the district court, and the court did not have a chance to consider all of those ramifications in the first instance. If there's no . . . One question. Martinez-Fuentes, the Supreme Court is struggling with this. Do they use the verb indicate and alert in that? Do you know? I don't . . . oh, no, they didn't, Your Honor, because that wasn't presented. It was whether or not . . . We have a lot of unpublished authority. And it is frequently saying, oh, indicate students, not necessarily alerts, weak ones, maybe strong ones. So there's a lot of confusion, but most of it's unpublished. What, before you sit down, is the strongest published Fisker case that you think supports your notion? Well, Your Honor, my read of Duvali-Avila . . . You're . . . . . . is that . . . . . . is very strong, and it, I believe, supports my position that, you know, the . . . Do you remember the little hyphenated phrase about stance and position, what it's been trained to do, that works? Do you have a memory of that? I don't, Your Honor, because . . . Yeah, I may be wrong. Okay. I'm sorry, I don't. No, no, no, no, I shouldn't have read it. If there's no further questions, I respectfully request the judgment be up front. Thank you, Ms. Baird. You've had a busy week. Yes, Your Honor. You saved time for rebuttal, Ms. Schiffman. Thank you, Your Honor. In Duvali-Avila, the court wrote that detection dogs are trained to alert, that is, to take a distinctive position or stance, as in the instance of a trained bird dog pointing to game. So Duvali-Avila was talking about alert, as in a true alert, as in an indication in the Border Patrol's terminology. And although the court in that opinion . . . That's a published opinion, am I right, Judge Jones was on that panel? Correct. And . . . He did say, we're going to clear it up once and for all. Right, which is . . . What was she contradistinguishing? Was that even a verb? What was she saying wouldn't be enough? Does she use the word alert or not? Yes, the opinion does use the word alert. It says that dogs are trained to alert. And in here, we have testimony about the training, and the dogs are trained to alert by sitting. We also have, in the Rivas case, they talked about the weak alert and the casting. In that case, the dog was trained to do an aggressive alert. And the court held that there was not sufficient suspicion based on the dog only doing a weak alert when it was trained to do an aggressive alert. And in the Harris Supreme Court case . . . In the Rivas, we did say this could change if there were experts. And here, we did have a lot of expert testimony. Right. And my arguments on appeal are based on the government's own witnesses that talked about the training program, and the secondary sniff procedure, and how that secondary sniff procedure was necessary because Border Patrol doesn't think it can only detect lawful activity in the primary area. And the physical intrusion of the agents into the vehicle before the secondary sniff procedure happened was a search. They called it a pre-search, but they described that as part of their process for trying to detect concealed humans. I thought they said they're looking for weapons, and it may have been an improper entry, but how did that affect Jagus? The dog has . . . When you look at the video, this dog is beelined from start to finish, and then it sits. So then you've got these . . . Border Patrol said, OK, that's the final word. That's what the Fifth Circuit says we need to have, and we've got it now. Right. And my argument is that gave probable cause, but too late because they'd already done the physical intrusion, which under Martinez-Fuerte and Ortiz and this court's Machuca-Barrera case, the immigration checkpoints, they're allowed to detain people, but they're not allowed to search. And all of those cases say that, that they're not allowed to search. And here it wasn't just saying, you know, Mr. Keller . . . The dog didn't search, right? I mean, OK. The dog didn't go in at that first momentary search. Forget that question. Right. What did the district court say about that door open entry? What did the district court rule as to that search? I'm not sure that the district court made a clear ruling on that, but as far as whether a search occurred, that would be a legal question anyway. And we have the video. Did you, have you preserved that as the real crux of this case? Was it argued below that that tainted the later? It was argued that the presumption of Harris didn't apply, which is my same argument on appeal. The Harris presumption doesn't apply because the secondary SNF procedure hadn't happened yet. The argument also below was that it was, you know, there was no consent in this case because that's another way the government could do a search if they didn't have, if they had consent or if they had probable cause. I guess I'm asking you just a strict question. It may not be the relevant one, but below, was it ever said to this district judge the momentary weapon search, pre-search, whatever it was called, tainted the eventual? Yes or no? Was that argued that it tainted this eventual one where PC had emerged? I don't think that very specific argument was made, but I would argue that the, under this court's case law, that the arguments were sufficiently presented to the district court to preserve them for appeal. They have evolved somewhat, but it's- You're arguing a team theory here, I guess, right? You're not arguing, you're just, right? I mean, one of my arguments does depend on that being a search, but there also was the trespass search, which happened before the secondary SNF procedure. So even if the dog had alerted, the trespass was a search before they had done the secondary SNF procedure. You've seen my hesitation both as to SNF equals search or trespass when dogs pause. I'm just not sure there's federal circuit law on that. You've been creative, you've given us state authority. Those are a little more difficult for me to grasp, but I understand that they are, we'll certainly look at them. I also rest my argument on all of the principles from the Supreme Court cases that developed these rules. In Harris, the training was what was most important. Here we have evidence about that training for concealed humans that hasn't been presented in other cases. And we have the presumption in Harris that's based on alert. Well, what did they mean by alert? It's right. I mean, dogs for avalanches and for earthquakes, dogs definitely can sense concealed humans. There's just no doubt about that. And my argument in this case, unlike Martinez, isn't that the dogs can't detect concealed humans. It's that they need the secondary SNF procedure to happen before they can have probable cause for concealed human detection based on the government's own witnesses. And for all those reasons, we ask the court to reverse and remand for further proceedings. Thank you. We have your argument. We appreciate both arguments today and the cases submitted.